# EXHIBIT B

# CAUSE NO. 24-17982

| | | |
|---|---|---|
| **IN RE:** | § | **IN THE 216 DISTRICT COURT OF** |
| | § | |
| **CREATE HEALTHY MANAGEMENT** | § | **GILLESPIE COUNTY, TEXAS** |

**FROM:** Ray Geistweidt, Past President of Hill Country Memorial Hospital
Original Member of Hill Country Memorial Foundation
Executor of Hannelore Schwindt Estate in which $6.25 million was placed in Hill Country Hospital Foundation as an endowment with income to be used only for improvements to Hill Country Memorial Hospital.
Counselor, Advisor, and Tax Preparer for Hannelore Schwindt and her husband (he predeceased her).

I hereby pray and petition the court to return the Hannelore Schwindt Endowment Fund (Schwindt Fund) to the Hannelore Schwindt Estate to be distributed amount the remaining residuary heirs since the purpose of the Schwindt Fund gift has evaporated with the sale of the hospital facility.

FILED
At 2:00 O'clock P M
DEC 27 2024
JAN DAVIS
DISTRICT CLERK
GILLESPIE COUNTY, TEXAS
By [signature], Deputy

## Parties

I am a member of a concerned group of citizens that use our theme, Medical Guardians.

## Factual Background

Hill Country Memorial Hospital was formed by concerned citizens to provide acute medical care to area residents. There are no stockholders. The governance was an internally elected board of "Trustees" whose duty was to insure operation of the hospital.

Hill Country Memorial Hospital Foundation was formed to provide a vehicle for collection of donations, endowments, charitable remainder annuities, and other sources of funds for Hill Country Memorial Hospital.

Ms. Jane Pope became the Hospital Administrator. The hospital prior to the sale was profitable.

I am enclosing the following:

I.      Exhibit A – A brief history and issues.

II.     Exhibit B – Excerpts from Create Healthy 2023 990.

          a.  Front page

          b.  Income statement by category

          c.  Statement of compensation of key employees.

          d.  Statement of key contributors.

III.    Exhibit C – Excerpts from HCA (50% owner and 100% operator of hospital in Fredericksburg) after the sale.

IV.     Exhibit D – Chart of Physicians etc. lost after sale and transfer of operations to HCA.

V.      Exhibit E – List of distributions to various organizations.

VI.     List of residuary beneficiaries of Hannelore Schwandt's will and amounts received. Exhibit F.

VII.    Hannelore's request for use of the funds granted to Hill Country Memorial Hospital. Exhibit G.

Who was Hannelore Schwindt, and what were her motives in her will.

**Hannelore Schwindt's life and attributes.**

I.     Childhood in Germany during and at end of World War II.

II.    Came to New York at age 18 to marry U.S. Citizen.

III.   Marriage did not last long and went to work for small company, International Business Machines (IBM).

IV.    Married Mr. Schwindt who was working as a mail clerk in a N.E. US casualty insurance company.

V.     He eventually became chairman of the board of the company, and they insured specialty products and companies all over the world.

VI.    They saved and invested wisely and retired to a summer home on a peninsula on the Atlantic Coast in upper Northeast US, and a winter home/ranch in Cherry Springs, Texas.

VII.   Mr. Schwindt died first leaving his ½ of the estate to Hannelore.

VIII.  Mrs. Schwindt was an avid reader and researcher into:

     a.    World cultures

     b.    Christianity

     c.    U.S. Constitution/Amendments/Freedom

     d.    Healthcare

     e.    Education

IX. Mrs. Schwindt required serious acute health care several times in her later years and was disappointed and aware that Hill Country Memorial Hospital needed new technology and equipment.

X. I counseled with her on her Estate plan and her conclusion was the following.

a. $2,000,000 (Estate Exclusion) cash to her relatives in Germany.

b. After expenses, the remaining assets were ¼ each to the following Non-Profit.

1. Hillsdale College – Nongovernment supported school that concentrated on the constitution, Christianity, and excellent educational accreditation.

2. Rockford Institute – An institution that researched and published papers on world cultures, trends, and events in relation to the Great U.S. Experiment and success with our Freedom and Governance.

3. Our local Community College – At that time, the local independent community college was scrambling for funds to build a campus so that kids could stay home, work, and afford college. Her goal was to provide that opportunity which her $6.25 million bequest provided the bulk of that building construction.

4. Hill Country Memorial Hospital Foundation – As you can tell in her will, it was very specific that her $6.25 million gift to into a strict endowment whose income was to go to improvements for Hill Country Memorial Hospital ONLY, not football jerseys, fire departments, day care centers, soccer fields etc.

## Conclusion

**FACTS:**

As you can tell from the hospital 990's prior to the sale, it was not losing money.

HCA is thinly capitalized (little to no equity), has a history of huge profits by cutting unprofitable services even if necessary for a complete acute local hospital to serve the community, has a history of fraudulent billings and collections from the U.S. and local governments, suppressing information to the community, large price increases for services retained, and forcing existing physicians, rank and file hospital staff, other local hospital related personnel into pay cuts, and force providers and staffers to use older, cheaper drugs for treatment.

The cost to administer the "Create Healthy Management" organization (old hospital corporation renamed) is much higher and less professional than Hill Country Community Foundation or the trust department of a community bank both of which would strictly adherent to the wishes of the donor rather than the wishes of a constantly changing group of trustees who are good people but have their own biases, agendas, and have other "day jobs" which require their attention.

## Request

I hereby request that you award the "Schwindt Fund" to the following residuary heirs.

a.    The Chronicles (successor to the Rockford Institute) which is continuing the purpose, goals, and agenda of the Rockford Institute.

b.    Hillsdale College if they participate in the fees and cost of this endeavor.


I do not recommend that the local college get any of these funds since they have already sold the buildings and abandoned the original intention of Mrs. Schwindt's bequest.

It is extremely disappointing to me and most of the locals that these two institutions abandoned the community's wishes, investment, donations, and work to satisfy fear of the future, fear of the work to survive, and fear of the ingenuity needed to succeed.

Therefore, please grant the foundation's Schwindt Fund to The Chronicles and Hillsdale College (if they join in) which are still serving their purpose and Mrs. Schwindt's wishes.

**Addendum**

For future reference, please consider that the source of acute medical costs for the working poor, the underinsured, and the non-insured poor which has in large part been provided by non-profit local hospitals will be coming out of over-burdened government funds rather than the "profits" of a local non-profit hospital.

Hill Country Memorial Hospital and the Community College converted their assets to deteriorating purchasing power money rather than honoring their forefathers' thoughts and investment in the future of our community, with local independent acute care facility and a locally controlled independent educational college.

RAY C GEISTWEIDT
12/27/24

755 S. WASHINGTON ST.
FREDERICKSBURG, TX 78624
office@gfcocpa.com
325-347-2655

# EXHIBIT A

# EXHIBIT A

## A Brief History and Issues Associated with the Sale of Hill Country Memorial Hospital

The announcement of Hill Country Memorial Hospital's sale to Methodist/HCA Healthcare on November 14, 2022, sent shockwaves through Fredericksburg, a town known for its quaint charm and award-winning community hospital. Residents, including longtime practitioners like John Westfall and his wife, Marguerite, were bewildered by the decision with John and Marguerite having spent over two decades dedicated to the hospital's values of compassion and excellence. As concerns, mounted, a grassroots group, Medical Guardians, formed to scrutinize the sales' motives and potential impact on the community. How could a community asset be sold without the input of the community?

The decision-making process behind the sale raised serious questions about transparency and community involvement. Despite being the largest employer in Gillespie County and providing significant charity care, profitably, the hospital's board opted for the sale without engaging key stakeholders or explaining the rationale adequately. City council members, like Sharon Joseph, voiced their concerns about the lack of information and the need for community representation in the decision-making process.

Efforts to seek clarification, such as a requested town hall meeting in February 2023, were met with resistance. However, the board eventually acquiesced, with the meeting being heavily controlled and leaving little room for genuine community input. As the community grappled with the impending sale and the establishment of a Health Conversion Foundation, parallels were drawn to similar transitions elsewhere, raising doubts about the process and leadership selection. The sale of HCMH represented a significant turning point for Fredericksburg's healthcare landscape, leaving residents with lingering uncertainties about the future of their cherished community hospital.

In response to the sale of Hill Country Memorial Hospital (HCMH) to Methodist/HCA healthcare, community members took action to seek transparency and accountability during this significant transition. Complaints were filed with the Texas Attorney General's (TXAG) Office of Charitable Trust, urging oversight and assistance. Efforts to keep the TXAG office informed about concerns persisted through diligent correspondence and discussions. As part of their efforts, the group sought critical documents such as the HCMH/Create Healthy Management (CHM) Bylaws, Conflict of Interest Policies, and the Asset Purchase Agreement (APA) through Public Information Act (PIA) requests.

Despite HCMH's profitable track record over the last decade and substantial COVID relief funds received, the decision to sell the community asset puzzled everyone. The comparison to the sale of Mission Hospital in North Carolina helped to shed light on the lack of transparency in Fredericksburg's sale process. In North Carolina, public engagement and APA disclosure were extensive, contrasting starkly with the secrecy surrounding HCMH's sale. Concerns persisted over the undisclosed terms of the APA and the board's failure to engage the community discussions.

During the transition period, questions arose about the new leadership and governance structure. Jayne Pope's (the person that orchestrated the sale of HCHM as its CEO) appointment as CEO of CHM, the legacy entity formed post-sale, raised questions about the board's authority and transparency. Requests for governing documents were met with delays and provided outdated information, leaving the community skeptical about the leadership's transparency and accountability. The revelation that the same individuals would oversee both the CHM and Create Healthy Foundation (CHF) boards further fueled concerns about accountability and conflicts of interest. Community members pressed for clarity and proper explanation, but transparency remained elusive, leaving many uncomfortable with the sale's implications and the subsequent governance structure.

The sale of Hill Country Memorial Hospital (HCMH) to Methodist/HCA healthcare raised concerns about the impact on the community and the quality of healthcare. Studies indicate that hospital mergers may not lead to cost savings or improved healthcare quality. Instead, prices ten to rise, potentially affecting accessibility and affordability. Furthermore, regulatory oversight is crucial to safeguard charitable assets and prevent violations such as fraud or mismanagement.

The appointment of directors from CHM to the CHF board, as outlined in CHF fka HCMH Foundation Bylaws, raised questions about accountability and potential conflicts of interest. The history of HCA healthcare, including a record $1.7 billion fraud settlement in 2003, added to concerns about the sale.

Community members, including former HCMH CEO Michael R. Williams, expressed dissatisfaction with the lack of transparency surrounding the sale and its potential consequences for patients and employees. Williams highlighted the erosion of trust and values within the hospital leadership and called for open dialogue and transparency in shaping the future of healthcare in Fredericksburg and Gillespie County.

# EXHIBIT B-a

PUBLIC DISCLOSURE COPY

Form **990**

# Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

Do not enter social security numbers on this form as it may be made public.

Go to *www.irs.gov/Form990* for instructions and the latest information.

Department of the Treasury Internal Revenue Service

OMB No. 1545-0047

**2023**

**Open to Public Inspection**

A For the 2023 calendar year, or tax year beginning , 2023, and ending , 20

B Check if applicable:
- ☐ Address change
- ☐ Name change
- ☐ Initial return
- ☐ Final return/terminated
- ☐ Amended return
- ☐ Application pending

C Name of organization CREATE HEALTHY MANAGEMENT

Doing business as

Number and street (or P.O. box if mail is not delivered to street address) P.O. BOX 1339 — Room/suite

City or town, state or province, country, and ZIP or foreign postal code FREDERICKSBURG, TX 78624

D Employer identification number 74-6083124

E Telephone number (830) 997-1297

G Gross receipts $ 204,701,382

F Name and address of principal officer: JAYNE POPE P.O. BOX 1339, FREDERICKSBURG 78624

H(a) Is this a group return for subordinates? ☐ Yes ☑ No

H(b) Are all subordinates included? ☐ Yes ☐ No

If "No," attach a list. See instructions.

I Tax-exempt status: ☑ 501(c)(3) ☐ 501(c) ( ) (insert no.) ☐ 4947(a)(1) or ☐ 527

J Website: WWW.CREATEHEALTHY.ORG

H(c) Group exemption number

K Form of organization: ☑ Corporation ☐ Trust ☐ Association ☐ Other

L Year of formation: 1994

M State of legal domicile: TX

## Part I Summary

**Activities & Governance**

1 Briefly describe the organization's mission or most significant activities: CREATE HEALTHY IS ON A MISSION FOR HEALTH AND WELLNESS IN OUR COMMUNITY; INVESTING IN WELLNESS AND EMPOWERING COMMUNITIES. CH IS (CONTINUED ON SCHEDULE O)

2 Check this box ☑ if the organization discontinued its operations or disposed of more than 25% of its net assets.

| Line | Description | No. | Value |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | 3 | 7 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | 4 | 7 |
| 5 | Total number of individuals employed in calendar year 2023 (Part V, line 2a) | 5 | 651 |
| 6 | Total number of volunteers (estimate if necessary) | 6 | 34 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | 7a | 0 |
| b | Net unrelated business taxable income from Form 990-T, Part I, line 11 | 7b | 0 |

| Line | Description | Prior Year | Current Year |
|---|---|---|---|
| **Revenue** | | | |
| 8 | Contributions and grants (Part VIII, line 1h) | 7,817,603 | 161,104 |
| 9 | Program service revenue (Part VIII, line 2g) | 95,161,603 | 21,940,433 |
| 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d) | 1,617,172 | 41,719,560 |
| 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | (3,464,773) | 4,608,875 |
| 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 101,131,605 | 68,429,972 |
| **Expenses** | | | |
| 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3) | 63,105 | 2,468,600 |
| 14 | Benefits paid to or for members (Part IX, column (A), line 4) | | |
| 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 36,972,787 | 11,657,567 |
| 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| b | Total fundraising expenses (Part IX, column (D), line 25) 0 | | |
| 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 62,417,181 | 18,378,037 |
| 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 99,453,073 | 32,504,204 |
| 19 | Revenue less expenses. Subtract line 18 from line 12 | 1,678,532 | 35,925,768 |
| **Net Assets or Fund Balances** | | **Beginning of Current Year** | **End of Year** |
| 20 | Total assets (Part X, line 16) | 231,936,244 | 207,017,901 |
| 21 | Total liabilities (Part X, line 26) | 21,861,780 | 3,638,894 |
| 22 | Net assets or fund balances. Subtract line 21 from line 20 | 210,074,464 | 203,379,007 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

**Sign Here**

Signature of officer — Date

JAYNE POPE, CEO

Type or print name and title

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| JEANETTE VERRELLI | JEANETTE VERRELLI | 11/15/2024 | | P00742631 |

Firm's name FORVIS MAZARS, LLP — Firm's EIN 44-0160260

Firm's address 14221 DALLAS PARKWAY SUITE 400, DALLAS, TX 75254 — Phone no. (972) 702-8262

May the IRS discuss this return with the preparer shown above? See instructions ☑ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. Cat. No. 11282Y Form 990 (2023)

# EXHIBIT B-b

2023

**Part VIII Statement of Revenue**

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . . . . . ☐

| Section | Line | Description | Line ref / Business Code | Amount | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|---|---|
| Contributions, Gifts, Grants, and Other Similar Amounts | 1a | Federated campaigns | 1a | | | | | |
| | b | Membership dues | 1b | | | | | |
| | c | Fundraising events | 1c | | | | | |
| | d | Related organizations | 1d | 161,104 | | | | |
| | e | Government grants (contributions) | 1e | | | | | |
| | f | All other contributions, gifts, grants, and similar amounts not included above | 1f | | | | | |
| | g | Noncash contributions included in lines 1a–1f | 1g | $ | | | | |
| | h | Total. Add lines 1a–1f | | | 161,104 | | | |
| Program Service Revenue | | | Business Code | | | | | |
| | 2a | NET PATIENT HOSPITAL REVENUE | 621110 | | 20,282,137 | 20,282,137 | | |
| | b | HOME HEALTH CARE REVENUE | 621610 | | 722,960 | 722,960 | | |
| | c | WELLNESS CENTER SERVICE REVENUE | 624100 | | 303,408 | 303,408 | | |
| | d | WIC PROGRAM REVENUE | 624100 | | 64,660 | 64,660 | | |
| | e | CLINIC RENT REVENUE | 531120 | | 211,930 | 211,930 | | |
| | f | All other program service revenue | 624100 | | 355,338 | 355,338 | 0 | 0 |
| | g | Total. Add lines 2a–2f | | | 21,940,433 | | | |
| Other Revenue | 3 | Investment income (including dividends, interest, and other similar amounts) | | | 5,096,072 | | | 5,096,072 |
| | 4 | Income from investment of tax-exempt bond proceeds | | | | | | |
| | 5 | Royalties | | | | | | |

| Line | Description | Ref | (i) Real | (ii) Personal |
|---|---|---|---|---|
| 6a | Gross rents | 6a | | |
| b | Less: rental expenses | 6b | | |
| c | Rental income or (loss) | 6c | 0 | 0 |

| Line | Description | Ref | (i) Securities | (ii) Other |
|---|---|---|---|---|
| 7a | Gross amount from sales of assets other than inventory | 7a | 98,056,743 | 74,748,028 |
| b | Less: cost or other basis and sales expenses | 7b | 97,962,308 | 38,218,975 |
| c | Gain or (loss) | 7c | 94,435 | 36,529,053 |

| Line | Description | Ref | Amount | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|---|
| 6d | Net rental income or (loss) | | | | | | |
| 7d | Net gain or (loss) | | | 36,623,488 | | | 36,623,488 |
| 8a | Gross income from fundraising events (not including $ ________ of contributions reported on line 1c). See Part IV, line 18 | 8a | | | | | |
| b | Less: direct expenses | 8b | | | | | |
| c | Net income or (loss) from fundraising events | | | | | | |
| 9a | Gross income from gaming activities. See Part IV, line 19 | 9a | | | | | |
| b | Less: direct expenses | 9b | | | | | |
| c | Net income or (loss) from gaming activities | | | | | | |
| 10a | Gross sales of inventory, less returns and allowances | 10a | 440,882 | | | | |
| b | Less: cost of goods sold | 10b | 90,127 | | | | |
| c | Net income or (loss) from sales of inventory | | | 350,755 | 350,755 | | |

| Section | Line | Description | Business Code | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512-514 |
|---|---|---|---|---|---|---|---|
| Miscellaneous Revenue | 11a | MISCELLANEOUS REVENUE | 900099 | 3,801,285 | 3,785,162 | | 16,123 |
| | b | BAD DEBT RECOVERY | 900099 | 454,590 | 454,590 | | |
| | c | AUXILIARY REVENUE | 900099 | 1,950 | 1,950 | | |
| | d | All other revenue | 561000 | 295 | 295 | 0 | 0 |
| | e | Total. Add lines 11a–11d | | 4,258,120 | | | |
| | 12 | Total revenue. See instructions | | 68,429,972 | 26,533,185 | 0 | 41,735,683 |

2023

**Part IX Statement of Functional Expenses**

*Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).*

Check if Schedule O contains a response or note to any line in this Part IX . . . ☑

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | (A) Total expenses | (B) Program service expenses | (C) Management and general expenses | (D) Fundraising expenses |
|---|---|---|---|---|
| 1 Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 | 2,418,408 | 2,418,408 | | |
| 2 Grants and other assistance to domestic individuals. See Part IV, line 22 | 50,192 | 50,192 | | |
| 3 Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16 | | | | |
| 4 Benefits paid to or for members | | | | |
| 5 Compensation of current officers, directors, trustees, and key employees | 2,286,661 | | 2,286,661 | |
| 6 Compensation not included above to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) | | | | |
| 7 Other salaries and wages | 6,867,624 | 6,073,032 | 794,592 | |
| 8 Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) | 83,952 | 83,952 | | |
| 9 Other employee benefits | 1,713,952 | 1,526,848 | 187,104 | |
| 10 Payroll taxes | 705,378 | 446,400 | 258,978 | |
| 11 Fees for services (nonemployees): | | | | |
| a Management | | | | |
| b Legal | 2,330,083 | | 2,330,083 | |
| c Accounting | 54,715 | | 54,715 | |
| d Lobbying | | | | |
| e Professional fundraising services. See Part IV, line 17 | | | | |
| f Investment management fees | | | | |
| g Other. (If line 11g amount exceeds 10% of line 25, column (A), amount, list line 11g expenses on Schedule O.) | 4,389,161 | 3,381,247 | 1,007,914 | 0 |
| 12 Advertising and promotion | 259,776 | 42,982 | 216,794 | |
| 13 Office expenses | 1,292,323 | 948,803 | 343,520 | |
| 14 Information technology | 183,968 | 67,043 | 116,925 | |
| 15 Royalties | | | | |
| 16 Occupancy | 1,695,007 | 1,182,300 | 512,707 | |
| 17 Travel | 37,965 | 20,499 | 17,466 | |
| 18 Payments of travel or entertainment expenses for any federal, state, or local public officials | | | | |
| 19 Conferences, conventions, and meetings | 18,928 | 18,928 | | |
| 20 Interest | 17,515 | | 17,515 | |
| 21 Payments to affiliates | | | | |
| 22 Depreciation, depletion, and amortization | 1,478,872 | 1,278,718 | 200,154 | |
| 23 Insurance | 106,784 | 48,253 | 58,531 | |
| 24 Other expenses. Itemize expenses not covered above. (List miscellaneous expenses on line 24e. If line 24e amount exceeds 10% of line 25, column (A), amount, list line 24e expenses on Schedule O.) | | | | |
| a MEDICAL SUPPLIES | 5,174,703 | 5,174,703 | | |
| b OTHER EXPENSES | 1,232,339 | 1,151,231 | 81,108 | |
| c RECRUITMENT & RECOGNITION | 44,900 | 13,270 | 31,630 | |
| d DUES & SUBSCRIPTIONS | 41,223 | 9,208 | 32,015 | |
| e All other expenses | 19,775 | 7,858 | 11,917 | 0 |
| 25 Total functional expenses. Add lines 1 through 24e | 32,504,204 | 23,943,875 | 8,560,329 | 0 |
| 26 Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ☐ if following SOP 98-2 (ASC 958-720) | | | | |

# EXHIBIT B-c

2021

...rs, Directors, Trustees, Key Employees, Highest Compensated Employees, and ...ors

...contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . . . . . . . . . . [X]

...ors, Trustees, Key Employees, and Highest Compensated Employees

...or all persons required to be listed. Report compensation for the calendar year ending with or within the

...e organization's current officers, directors, trustees (whether individuals or organizations), regardless of amount of ...nter -0- in columns (D), (E), and (F) if no compensation was paid.

... of the organization's current key employees, if any. See the instructions for definition of "key employee."

...f the organization's five current highest compensated employees (other than an officer, director, trustee, or key employee) received reportable compensation (box 5 of Form W-2, Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than ...00,000 from the organization and any related organizations.s

- List all of the organization's former officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's former directors or trustees that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

[ ] Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/ 1099-MISC/ 1099-NEC) | (E) Reportable compensation from related organizations (W-2/ 1099-MISC/ 1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) JAYNE POPE<br>CEO | 39.00<br>1.00 | | | X | | | | 553,451. | NONE | 24,831. |
| (2) CLINTON KOTAL<br>CHIEF INTEGRATION OFFICER | 15.75<br>24.25 | | | | X | | | 414,239. | NONE | 45,082. |
| (3) SUSAN NEVES<br>CFO | 39.00<br>1.00 | | | X | | | | 401,367. | NONE | 23,633. |
| (4) NIKKI RIVERS<br>CHIEF CLINICAL OFFICER | 40.00<br>NONE | | | | X | | | 283,995. | NONE | NONE |
| (5) MAUREEN POLIVKA<br>CNO | 40.00<br>NONE | | | | X | | | 273,917. | NONE | 8,769. |
| (6) AMANDA STEVENS<br>CSO/FDN EXECUTIVE DIRECTOR | 20.00<br>20.00 | | | | X | | | 116,719. | 116,719. | 38,834. |
| (7) JAMES PARTIN<br>CMO | 40.00<br>NONE | | | | X | | | 238,675. | NONE | NONE |
| (8) LE ANN MYERS<br>DIRECTOR OF ANCILLARY SERVICES | 40.00<br>NONE | | | | | X | | 215,792. | NONE | 20,077. |
| (9) KATELYN VINKLAREK<br>DIRECTOR POST ACUTE SERVICES | 30.00<br>10.00 | | | | | X | | 176,552. | NONE | 40,353. |
| (10) RITA URBANEK<br>DIRECTOR OF POPULATION HEALTH | 35.00<br>5.00 | | | | | X | | 179,421. | NONE | 37,112. |
| (11) KEVIN SHANE DICKINSON<br>IT DIRECTOR | 25.00<br>15.00 | | | | | X | | 174,344. | NONE | 28,449. |
| (12) TIMOTHY BOYD ROBERTS<br>FACILITY DIRECTOR | 25.00<br>15.00 | | | | | X | | 152,526. | NONE | 29,337. |
| (13) PENNY MCBRIDE<br>CHAIRMAN | 0.85<br>1.00 | X | | X | | | | NONE | NONE | NONE |
| (14) JENNY WIESER<br>VICE CHAIR | 0.56<br>1.00 | X | | X | | | | NONE | NONE | NONE |

Form 990 (2021)

JSA 1E1041 1.000 ...5AOM P98P 11/14/2022 13:31:27 0280431

Directors, Trustees, Key Employees, Highest Compensated Employees, ...ractors

. contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . . ☒

Directors, Trustees, Key Employees, and Highest Compensated Employees

...le for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax

...ll of the organization's current officers, directors, trustees (whether individuals or organizations), regardless of amount ...mpensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

- List all of the organization's current key employees, if any. See the instructions for definition of "key employee."
- List the organization's five current highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's former officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's former directors or trustees that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

2022

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position: Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E) Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) JAYNE POPE<br>CEO | 39.0<br>1.0 | | | X | | | | 492,937 | 0 | 24,606 |
| (2) CLINTON KOTAL<br>CHIEF INTEGRATION OFFICER | 15.75<br>24.25 | | | | X | | | 333,673 | 0 | 48,946 |
| (3) SUSAN NEVES<br>CFO | 39.0<br>1.0 | | | X | | | | 378,955 | 0 | 30,715 |
| (4) MAUREEN POLIVKA<br>CNO | 40.0<br>0.0 | | | | X | | | 279,741 | 0 | 20,286 |
| (5) AMANDA STEVENS<br>CHIEF STRATEGY OFFICER | 20.0<br>20.0 | | | | X | | | 107,675 | 107,676 | 41,309 |
| (6) JAMES PARTIN<br>CMO | 40.0<br>0.0 | | | | X | | | 234,103 | 0 | 0 |
| (7) LEANN MYERS<br>DIRECTOR OF ANCILLARY SERVICES | 40.0<br>0.0 | | | | | X | | 204,250 | 0 | 20,327 |
| (8) KEVIN SHANE DICKINSON<br>IT DIRECTOR | 25.0<br>15.0 | | | | | X | | 181,027 | 0 | 37,914 |
| (9) KATELYN VINKLAREK<br>DIRECTOR POST ACUTE SERVICES | 20.0<br>20.0 | | | | | X | | 175,503 | 0 | 42,324 |
| (10) CHRISTINE DAMEWOOD<br>NURSING DIRECTOR | 40.0<br>0.0 | | | | | X | | 166,597 | 0 | 35,796 |
| (11) SHANNA WILLIAMS<br>NURSING DIRECTOR | 40.0<br>0.0 | | | | | X | | 166,215 | 0 | 0 |
| (12) JENNY WEISER PHD<br>CHAIRMAN | 0.65<br>1.0 | X | | X | | | | 0 | 0 | 0 |
| (13) Penny McBride<br>Director | 0.56<br>1.0 | X | | | | | | 0 | 0 | 0 |
| (14) JOEL JUNKER<br>SECRETARY | 0.5<br>1.0 | X | | X | | | | 0 | 0 | 0 |

2023

**Part VII Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

- List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
- List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
- List the organization's five **current** highest compensated employees (other than an officer, director, trustee, or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
- List all of the organization's **former** officers, key employees, and highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
- List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/ 1099-MISC/ 1099-NEC) | (E) Reportable compensation from related organizations (W-2/ 1099-MISC/ 1099-NEC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) JAYNE POPE<br>CEO | 37.0<br>2.8 | | | ✔ | | | | 789,610 | 0 | 29,489 |
| (2) CLINTON KOTAL<br>CHIEF INTEGRATION OFFICER | 20.8<br>19.2 | | | | ✔ | | | 417,519 | 0 | 20,578 |
| (3) SUSAN NEVES<br>CFO | 39.0<br>1.0 | | | ✔ | | | | 415,975 | 0 | 19,892 |
| (4) AMANDA STEVENS<br>CHIEF STRATEGY OFFICER | 30.0<br>10.0 | | | | ✔ | | | 181,856 | 91,303 | 33,907 |
| (5) MAUREEN O POLIVKA<br>CNO | 40.0<br>0.0 | | | | ✔ | | | 182,203 | 0 | 17,049 |
| (6) CHRIS SEMMLER<br>VP OF FINANCE | 38.0<br>2.0 | | | ✔ | | | | 180,351 | 0 | 8,830 |
| (7) JANICE MENKING<br>CONTROLLER | 32.0<br>0.0 | | | | | ✔ | | 148,981 | 0 | 12,898 |
| (8) CHRIS SCHOESSOW<br>DIRECTOR, VICE PRESIDENT | 0.5<br>1.0 | ✔ | | ✔ | | | | 0 | 0 | 0 |
| (9) JENNY WEISER, PHD<br>CHAIRMAN | 0.9<br>1.0 | ✔ | | ✔ | | | | 0 | 0 | 0 |
| (10) JOEL JUNKER<br>SECRETARY | 0.5<br>1.0 | ✔ | | ✔ | | | | 0 | 0 | 0 |
| (11) CARLIN FRIAR<br>DIRECTOR | 0.5<br>1.0 | ✔ | | | | | | 0 | 0 | 0 |
| (12) DALE CRENWELGE<br>DIRECTOR | 0.5<br>1.0 | ✔ | | | | | | 0 | 0 | 0 |
| (13) DAN SECHRIST<br>DIRECTOR | 0.5<br>1.0 | ✔ | | | | | | 0 | 0 | 0 |
| (14) DR. KEVIN GALLAGHER<br>DIRECTOR | 0.5<br>1.0 | ✔ | | | | | | 0 | 0 | 0 |

# 2023

Schedule J, Compensation Information, states there was a change of control payment (4a) and Schedule J gives the breakdown of these payments. On this return all employees who received retention bonuses (column iii) are reflected. To see the total $1,287,553 million dollars disbursement see the attached schedule. Amanda Stevens

Schedule J (Form 990) 2023 Page 2

**Part II** **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that aren't listed on Form 990, Part VII.

Note: The sum of columns (B)(i)–(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B)(i) Base compensation | (B)(ii) Bonus & incentive compensation | (B)(iii) Other reportable compensation | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)–(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| 1 JAYNE POPE, CEO | (i) | 379,610 | 0 | 410,000 | 18,151 | 11,337 | 819,098 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 CLINTON KOTAL, CHIEF INTEGRATION OFFICER | (i) | 92,519 | 0 | 325,000 | 12,200 | 8,378 | 438,097 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 SUSAN NEVES, CFO | (i) | 90,975 | 0 | 325,000 | 12,200 | 7,692 | 435,867 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 AMANDA STEVENS, CHIEF STRATEGY OFFICER | (i) | 135,607 | 0 | 46,249 | 8,309 | 15,002 | 205,167 | 0 |
| | (ii) | 45,054 | 0 | 46,249 | 4,505 | 6,091 | 101,899 | 0 |
| 5 MAUREEN O POLIVKA, CNO | (i) | 65,077 | 0 | 116,125 | 9,358 | 7,691 | 199,253 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 CHRIS SEMMLER, VP OF FINANCE | (i) | 160,557 | 19,793 | 0 | 8,830 | 0 | 189,180 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 7 JANICE MENKING, CONTROLLER | (i) | 108,191 | 21,961 | 18,929 | 5,495 | 7,203 | 161,579 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 8 | (i) | | | | | | | |
| | (ii) | | | | | | | |

**Employee Retention Bonus**

# EXHIBIT B-d

2021

Name of organization: HILL COUNTRY MEMORIAL HOSPITAL

Employer identification number: 74-6083124

**Part I** Contributors (see instructions). Use duplicate copies of Part I if additional space is needed.

| (a) No. | (b) Name, address, and ZIP + 4 | (c) Total contributions | (d) Type of contribution |
|---|---|---|---|
| 1 | SAMUEL W. FORDYCE<br>300 HOT SPRINGS RD. #L223<br>SANTA BARBARA, CA 93108 | $ 243,334. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 2 | JULIE E. MONTGOMERY<br>204 W CREEK STREET<br>FREDERICKSBURG, TX 78624 | $ 5,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 3 | BARBARA L. RICHARDSON<br>PO BOX 1369<br>FREDERICKSBURG, TX 78624 | $ 50,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 4 | VICTORIA A. RUST<br>611 COURTNEY<br>FREDERICKSBURG, TX 78624 | $ 7,765. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 5 | LINDA G. WHITE<br>PO BOX 759<br>FREDERICKSBURG, TX 78624 | $ 33,333. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 6 | DON L. AND JULIE HOLDEN FOUNDATION, INC.<br>PO BOX 2161<br>FREDERICKSBURG, TX 78624 | $ 500,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |

2021

Name of organization: HILL COUNTRY MEMORIAL HOSPITAL

Employer identification number: 74-6083124

**Part I** Contributors (see instructions). Use duplicate copies of Part I if additional space is needed.

| (a) No. | (b) Name, address, and ZIP + 4 | (c) Total contributions | (d) Type of contribution |
|---|---|---|---|
| 7 | HELMS FOUNDATION, INC.<br>18201 VON KARMAN AVENUE, SUITE 450<br>IRVINE, CA 92612 | $ 10,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 8 | MOODY FOUNDATION<br>2302 POST OFFICE STREET, SUITE 704<br>GALVESTON, TX 77550 | $ 13,231. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 9 | MORGAN FAMILY FUND<br>851 BRUNS KOEHNE RD.<br>ROUND MOUNTAIN, TX 78663 | $ 5,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 10 | STARK MARTIN CHARITABLE TRUST<br>ONE NORTH CENTRAL AVE, SUITE 1200<br>PHOENIX, AZ 85004 | $ 18,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 11 | STINSON FAMILY FOUNDATION<br>315 W COLLEGE<br>FREDERICKSBURG, TX 78624 | $ 100,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 12 | THE COLEMAN FAMILY FUND<br>8910 PURDUE RD, STE 500<br>INDIANAPOLIS, IN 46268 | $ 5,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |

2021

Name of organization: HILL COUNTRY MEMORIAL HOSPITAL

Employer identification number: 74-6083124

**Part I** Contributors (see instructions). Use duplicate copies of Part I if additional space is needed.

| (a) No. | (b) Name, address, and ZIP + 4 | (c) Total contributions | (d) Type of contribution |
|---|---|---|---|
| 13 | THE J.E. AND L.E. MABEE FOUNDATION, INC.<br>CLAYDESTA CENTER, 6 DESTADRIVE, SUITE 54<br>MIDLAND, TX 79705 | $ 1,000,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 14 | THE PERRY AND RUBY STEVENS CHARITABLE FO<br>PO BOX 291929<br>KERRVILLE, TX 78029 | $ 500,000. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 15 | TEXAS DEPARTMENT OF AGRICULTURE SHIP PRO<br>1700 N. CONGRESS, 11TH FLOOR<br>AUSTIN, TX 78701 | $ 10,287. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 16 | US DEPT OF HEALTH & HUMAN SERVICES<br>200 INDEPENDENCE AVE SW<br>WASHINGTON, DC 20201 | $ 6,346,331. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| 17 | HILL COUNTRY MEMORIAL HOSP FOUNDATION<br>P.O. BOX 1339<br>FREDERICKSBURG, TX 78624 | $ 888,927. | Person [X]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |
| | | $ | Person [ ]<br>Payroll [ ]<br>Noncash [ ]<br>(Complete Part II for noncash contributions.) |

# EXHIBIT C

# HCA HEALTHCARE, INC.
## CONSOLIDATED BALANCE SHEETS
### DECEMBER 31, 2023 AND 2022
(Dollars in millions)

| | 2023 | 2022 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 935 | $ 908 |
| Accounts receivable | 9,958 | 8,891 |
| Inventories | 2,021 | 2,068 |
| Other | 2,013 | 1,776 |
| | 14,927 | 13,643 |
| Property and equipment, at cost: | | |
| Land | 3,120 | 2,799 |
| Buildings | 21,560 | 20,221 |
| Equipment | 31,998 | 29,981 |
| Construction in progress | 1,870 | 1,756 |
| | 58,548 | 54,757 |
| Accumulated depreciation | (30,833) | (29,182) |
| | 27,715 | 25,575 |
| Investments of insurance subsidiaries | 477 | 381 |
| Investments in and advances to affiliates | 756 | 823 |
| Goodwill and other intangible assets | 9,945 | 9,653 |
| Right-of-use operating lease assets | 2,207 | 2,065 |
| Other | 184 | 298 |
| | $ 56,211 | $ 52,438 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | | |
| Current liabilities: | | |
| Accounts payable | $ 4,233 | $ 4,239 |
| Accrued salaries | 2,127 | 1,712 |
| Other accrued expenses | 3,871 | 3,581 |
| Long-term debt due within one year | 2,424 | 370 |
| | 12,655 | 9,902 |
| Long-term debt, less debt issuance costs and discounts of $333 and $301 | 37,169 | 37,714 |
| Professional liability risks | 1,557 | 1,528 |
| Right-of-use operating lease obligations | 1,903 | 1,752 |
| Income taxes and other liabilities | 1,867 | 1,615 |
| Stockholders' equity (deficit): | | |
| Common stock $0.01 par; authorized 1,800,000,000 shares; outstanding 265,537,300 shares — 2023 and 277,378,300 shares — 2022 | 3 | 3 |
| Accumulated other comprehensive loss | (425) | (490) |
| Retained deficit | (1,352) | (2,280) |
| Stockholders' deficit attributable to HCA Healthcare, Inc. | (1,774) | (2,767) |
| Noncontrolling interests | 2,834 | 2,694 |
| | 1,060 | (73) |
| | $ 56,211 | $ 52,438 |

Handwritten annotations: "9/54: 365"; "(2) 11,841,000 SHARES REDEEMED"; "NEGATIVE CAPITAL"

(1) CURRENT RATIO SLIPPING
(2) "CONTROLLING" INTERESTS ARE REDEEMING SHARES EACH YEAR TO CONSOLIDATE INCREASE THEIR OWNERSHIP PERCENTAGE.

The accompanying notes are an integral part of the consolidated financial statements.

# HCA HEALTHCARE, INC.
## CONSOLIDATED INCOME STATEMENTS
### FOR THE YEARS ENDED DECEMBER 31, 2023, 2022 AND 2021
(Dollars in millions, except per share amounts)

$ 65 BILLION

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Revenues | $ 64,968 | $ 60,233 | $ 58,752 |
| Salaries and benefits | 29,487 | 27,685 | 26,779 |
| Supplies | 9,902 | 9,371 | 9,481 |
| Other operating expenses | 12,875 | 11,155 | 9,961 |
| Equity in earnings of affiliates | (22) | (45) | (113) |
| Depreciation and amortization | 3,077 | 2,969 | 2,853 |
| Interest expense | 1,938 | 1,741 | 1,566 |
| Losses (gains) on sales of facilities | 5 | (1,301) | (1,620) |
| Losses on retirement of debt | — | 78 | 12 |
| | 57,262 | 51,653 | 48,919 |
| Income before income taxes | 7,706 | 8,580 | 9,833 |
| Provision for income taxes | 1,615 | 1,746 | 2,112 |
| Net income | 9.4% 6,091 | 11.34 6,834 | 13.14 7,721 |
| Net income attributable to noncontrolling interests | 849 | 1,191 | 765 |
| Net income attributable to HCA Healthcare, Inc. | $ 5,242 | $ 5,643 | $ 6,956 |
| Per share data: | | | |
| Basic earnings per share | $ 19.25 | $ 19.43 | $ 21.52 |
| Diluted earnings per share | $ 18.97 | $ 19.15 | $ 21.16 |
| Shares used in earnings per share calculations (in millions): | | | |
| Basic | 272.404 | 290.348 | 323.315 |
| Diluted | 276.412 | 294.666 | 328.752 |

(4) PROFIT RATIO HIGH BUT SLIPPING

(3) EXPENSES $ 57,262 ÷ 365 DAYS = $ 156.9 MILLION/DAY SPENT

$ 908 CASH IN BANK ÷ 156.9 EXPENSES/DAY = 5.8 DAYS OPERATING MONEY

VERY TIGHT - IF RECEIVABLES COLLECTIONS SLOW DOWN - THEY WILL HURT.

The accompanying notes are an integral part of the consolidated financial statements.

**HCA HEALTHCARE, INC.**
**CONSOLIDATED COMPREHENSIVE INCOME STATEMENTS**
**FOR THE YEARS ENDED DECEMBER 31, 2023, 2022 AND 2021**
**(Dollars in millions)**

CONTINUATION

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| Net income | $ 6,091 | $ 6,834 | $ 7,721 |
| Other comprehensive income (loss) before taxes: | | | |
| Foreign currency translation | 41 | (111) | (9) |
| Unrealized gains (losses) on available-for-sale securities | 11 | (55) | (16) |
| Losses (gains) included in other operating expenses | (1) | 1 | — |
| | 10 | (54) | (16) |
| Defined benefit plans | 27 | 49 | 87 |
| Pension costs included in salaries and benefits | 3 | 9 | 28 |
| | 30 | 58 | 115 |
| Change in fair value of derivative financial instruments | — | 6 | 1 |
| Interest costs included in interest expense | — | 2 | 37 |
| | — | 8 | 38 |
| Other comprehensive income (loss) before taxes | 81 | (99) | 128 |
| Income taxes (benefits) related to other comprehensive income items | 16 | (13) | 30 |
| Other comprehensive income (loss) | 65 | (86) | 98 |
| Comprehensive income | 6,156 | 6,748 | 7,819 |
| Comprehensive income attributable to noncontrolling interests | 849 | 1,191 | 765 |
| Comprehensive income attributable to HCA Healthcare, Inc. | $ 5,307 | $ 5,557 | $ 7,054 |

OTHER INCOME STATEMENT INFORMATION

The accompanying notes are an integral part of the consolidated financial statements.

**HCA HEALTHCARE, INC.**
**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (DEFICIT)**
**FOR THE YEARS ENDED DECEMBER 31, 2023, 2022 AND 2021**
**(Dollars in millions, except per share amounts)**

| | Equity (Deficit) Attributable to HCA Healthcare, Inc. | | | | | Equity | |
|---|---|---|---|---|---|---|---|
| | Common Stock | | Capital in Excess of Par Value | Accumulated Other Comprehensive Loss | Retained Earnings (Deficit) | Attributable to Noncontrolling Interests | Total |
| | Shares (in millions) | Par Value | | | | | |
| Balances, December 31, 2020 | 339.426 | $ 3 | $ 294 | $ (502) | $ 777 | $ 2,320 | $ 2,892 |
| Comprehensive income | | | | 98 | 6,956 | 765 | 7,819 |
| Repurchase of common stock | (37.812) | | (578) | | (7,637) | | (8,215) |
| Share-based benefit plans | 3.863 | | 280 | | | | 280 |
| Cash dividends declared ($1.92 per share) | | | | | (628) | | (628) |
| Distributions | | | | | | (749) | (749) |
| Other | | | 4 | | | 86 | 90 |
| Balances, December 31, 2021 | 305.477 | 3 | — | (404) | (532) | 2,422 | 1,489 |
| Comprehensive income (loss) | | | | (86) | 5,643 | 1,191 | 6,748 |
| Repurchase of common stock | (30.747) | | (264) | | (6,736) | | (7,000) |
| Share-based benefit plans | 2.648 | | 282 | | | | 282 |
| Cash dividends declared ($2.24 per share) | | | | | (655) | | (655) |
| Distributions | | | | | | (1,025) | (1,025) |
| Other | | | (18) | | | 106 | 88 |
| Balances, December 31, 2022 | 277.378 | 3 | — | (490) | (2,280) | 2,694 | (73) |
| Comprehensive income | | | | 65 | 5,242 | 849 | 6,156 |
| Repurchase of common stock | (14.465) | | (186) | | (3,656) | | (3,842) |
| Share-based benefit plans | 2.624 | | 172 | | | | 172 |
| Cash dividends declared ($2.40 per share) | | | | | (658) | | (658) |
| Distributions | | | | | | (640) | (640) |
| Other | | | 14 | | | (69) | (55) |
| Balances, December 31, 2023 | 265.537 | $ 3 | $ — | $ (425) | $ (1,352) | $ 2,834 | $ 1,060 |

The accompanying notes are an integral part of the consolidated financial statements.

# HCA HEALTHCARE, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS
## FOR THE YEARS ENDED DECEMBER 31, 2023, 2022 AND 2021
## (Dollars in millions)

| | 2023 | 2022 | 2021 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 6,091 | $ 6,834 | $ 7,721 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Increase (decrease) in cash from operating assets and liabilities: | | | |
| Accounts receivable | (935) | (797) | (962) |
| Inventories and other assets | (126) | (59) | (540) |
| Accounts payable and accrued expenses | 604 | (296) | 999 |
| Depreciation and amortization NON-CASH EXPENSE ① | 3,077 | ① 2,969 | ① 2,853 |
| Income taxes | 229 | 571 | (70) |
| Losses (gains) on sales of facilities | 5 | (1,301) | (1,620) |
| Losses on retirement of debt | — | 78 | 12 |
| Amortization of debt issuance costs and discounts | 35 | 29 | 27 |
| Share-based compensation | 262 | 341 | 440 |
| Other | 189 | 153 | 99 |
| Net cash provided by operating activities | 9,431 | 8,522 | 8,959 |
| **Cash flows from investing activities:** | | | |
| Purchase of property and equipment ① | (4,744) | ① (4,395) | ① (3,577) |
| Acquisition of hospitals and health care entities | (635) | (224) | (1,105) |
| Sales of hospitals and health care entities | 193 | 1,237 | 2,160 |
| Change in investments | (112) | 14 | (117) |
| Other | (19) | (21) | (4) |
| Net cash used in investing activities | (5,317) | (3,389) | (2,643) |
| **Cash flows from financing activities:** | | | |
| Issuances of long-term debt BORROWING MONEY ② | 3,224 | ② 5,997 | ② 4,344 |
| Net change in revolving credit facilities | (1,020) | 120 | 2,780 |
| Repayment of long-term debt PAYMENT OF DEBT ② | (909) | ② (2,830) | ② (3,869) |
| Distributions to noncontrolling interests | (640) | (1,025) | (749) |
| Payment of debt issuance costs | (31) | (53) | (38) |
| Payment of dividends | (661) | (653) | (624) |
| Repurchase of common stock | (3,811) | (7,000) | (8,215) |
| Other | (246) | (212) | (284) |
| Net cash used in financing activities | (4,094) | (5,656) | (6,655) |
| Effect of exchange rate changes on cash and cash equivalents | 7 | (20) | (3) |
| Change in cash and cash equivalents | 27 | (543) | (342) |
| Cash and cash equivalents at beginning of period | 908 | 1,451 | 1,793 |
| Cash and cash equivalents at end of period | $ 935 | $ 908 | $ 1,451 |
| Interest payments | $ 1,892 | $ 1,662 | $ 1,502 |
| Income tax payments, net | $ 1,386 | $ 1,175 | $ 2,182 |

① MOST OF PURCHASES CASH IS A NON-CASH EXPENSE <DEPRECIATION> CASH GENERATED.

② BORROWING MORE THAN THEY ARE PAYING BACK

The accompanying notes are an integral part of the consolidated financial statements.

## NOTE 7 — ASSETS AND LIABILITIES MEASURED AT FAIR VALUE (continued)

| | 2022 | | | |
|---|---|---|---|---|
| | | Fair Value Measurements Using | | |
| | Fair Value | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) |
| Debt securities | $ 377 | $ — | $ 377 | $ — |
| Money market funds and other | 96 | 96 | — | — |
| Investments of insurance subsidiaries | 473 | 96 | 377 | — |
| Less amounts classified as current assets | (92) | (92) | — | — |
| | $ 381 | $ 4 | $ 377 | $ — |

The estimated fair value of our long-term debt was $38.253 billion and $35.555 billion at December 31, 2023 and 2022, respectively, compared to carrying amounts, gross of debt issuance costs and discounts, aggregating $39.926 billion and $38.385 billion, respectively. The estimates of fair value are generally based on Level 2 inputs, including quoted market prices or quoted market prices for similar issues of long-term debt with the same maturities.

## NOTE 8 — LONG-TERM DEBT

A summary of long-term debt at December 31, including related interest rates at December 31, 2023, follows (dollars in millions):

| | 2023 | 2022 |
|---|---|---|
| Senior secured asset-based revolving credit facility (effective interest rate of 6.7%) | $ 1,880 | $ 2,900 |
| Senior secured revolving credit facility | — | — |
| Senior secured term loan facilities (effective interest rate of 6.8%) | 1,313 | 1,880 |
| Other senior secured debt (effective interest rate of 4.1%) | 967 | 953 |
| Senior secured debt | 4,160 | 5,733 |
| Senior unsecured notes (effective interest rate of 5.0%) | 35,766 | 32,652 |
| Debt issuance costs and discounts | (333) | (301) |
| Total debt (average life of 9.4 years, rates averaging 5.1%) | 39,593 | 38,084 |
| Less amounts due within one year | 2,424 | 370 |
| | $ 37,169 | $ 37,714 |

During 2023, the availability under our senior secured revolving credit facility was increased by $1.500 billion to total $3.500 billion, the senior secured term loan B facility was fully retired and certain administrative updates were made to our credit agreements. We also issued $3.250 billion aggregate principal amount of senior notes comprised of (i) $1.000 billion aggregate principal amount of 5.200% senior notes due 2028, (ii) $1.250 billion aggregate principal amount of 5.500% senior notes due 2033 and (iii) $1.000 billion aggregate principal amount of 5.900% senior notes due 2053. We used the net proceeds to repay borrowings under our asset-based revolving credit facility.

*Senior Secured Credit Facilities And Other Senior Secured Debt*

We have entered into the following senior secured credit facilities: (i) a $4.500 billion asset-based revolving credit facility maturing on June 30, 2026 with a borrowing base of 85% of eligible accounts receivable, subject to customary reserves and eligibility criteria ($1.880 billion outstanding at December 31, 2023) (the "ABL credit facility"); (ii) a $3.500 billion senior secured revolving credit facility maturing on June 30, 2026 (none outstanding at December 31, 2023 without giving effect to certain outstanding letters of credit); and (iii) a $1.313 billion senior secured term loan facility maturing on June 30, 2026. We refer to the facilities described under (ii) and (iii) above, collectively, as the "cash flow credit facility" and, together with the ABL credit facility, the "senior secured credit facilities." Finance leases and other secured debt totaled $967 million at December 31, 2023.

**NOTE 8 — LONG-TERM DEBT (continued)**

Borrowings under the senior secured credit facilities bear interest at a rate equal to, at our option, either (a) a base rate determined by reference to the higher of (1) the federal funds rate plus 0.50% or (2) the prime rate of Bank of America or (b) a reference rate (the Secured Overnight Financing Rate (SOFR)) for the relevant interest period, plus, in each case, an applicable margin. The applicable margin for borrowings under the senior secured credit facilities may be reduced subject to attaining certain leverage ratios.

The senior secured credit facilities contain a number of covenants that restrict, subject to certain exceptions, our (and some or all of our subsidiaries') ability to incur additional indebtedness, repay subordinated indebtedness, create liens on assets, sell assets, make investments, loans or advances, engage in certain transactions with affiliates, pay dividends and distributions, and enter into sale and leaseback transactions. In addition, we are required to satisfy and maintain a maximum total leverage ratio covenant under the cash flow credit facility and, in certain situations under the ABL credit facility, a minimum interest coverage ratio covenant.

*Senior Unsecured Notes* — THERE ARE LOAN COVENANTS ON THIS DEBT.

Senior unsecured notes consist of (i) $35.041 billion aggregate principal amount of senior notes with maturities ranging from 2024 to 2053; (ii) an aggregate principal amount of $125 million medium-term notes maturing 2025; and (iii) an aggregate principal amount of $600 million debentures with maturities ranging from 2024 to 2095.

*General Debt Information*

The senior secured credit facilities are fully and unconditionally guaranteed by substantially all existing and future, direct and indirect, 100% owned material domestic subsidiaries that are "Unrestricted Subsidiaries" under our Indenture (the "1993 Indenture") dated December 16, 1993 (except for certain special purpose subsidiaries that only guarantee and pledge their assets under our ABL credit facility).

All obligations under the ABL credit facility, and the guarantees of those obligations, are secured, subject to permitted liens and other exceptions, by a first-priority lien on substantially all of the receivables of the borrowers and each guarantor under such ABL credit facility (the "Receivables Collateral").

All obligations under the cash flow credit facility and the guarantees of such obligations are secured, subject to permitted liens and other exceptions, by:

- a first-priority lien on the capital stock owned by HCA Inc., or by any guarantor, in each of their respective first-tier subsidiaries;
- a first-priority lien on substantially all present and future assets of HCA Inc. and of each guarantor other than (i) "Principal Properties" (as defined in the 1993 Indenture), (ii) certain other real properties and (iii) deposit accounts, other bank or securities accounts, cash, leaseholds, motor-vehicles and certain other exceptions; and
- a second-priority lien on certain of the Receivables Collateral.

Maturities of long-term debt in years 2025 through 2028 are $4.672 billion, $5.350 billion, $2.408 billion and $2.545 billion, respectively.

**NOTE 9 — LEASES**

We lease property and equipment under finance and operating leases. For leases with terms greater than 12 months, we record the related assets and obligations at the present value of lease payments over the term. Many of our leases include rental escalation clauses and renewal options that are factored into our determination of lease payments, when appropriate. We do not separate lease and nonlease components of contracts. Generally, we use our estimated incremental borrowing rate to discount the lease payments, as most of our leases do not provide a readily determinable implicit interest rate.

# EXHIBIT D

**Medical Services Update** – Dr. Robert Murray – December 1, 2024

Fredericksburg.........We are in trouble regarding medical services

It has been two years since the people of our county were told about the secret sale of our independent community hospital (Medicare 5-star rated) to a for-profit corporation Methodist Healthcare San Antonio (2-star rated) and Hospital Corporation of America(HCA) based in Tennessee. One of the many concerns townspeople have expressed with the sale is the inherent struggle between profits (or what's best for stock price) and patients (or what services are best for our community). We were told by a small group of people that our hospital had to be sold because it would be too difficult to make it as an independent hospital. Please, someone alert Sid Peterson! We were warned before the sale that when independent rural hospitals are taken over by a larger health system, they experienced a significant reduction in **onsite diagnostic imaging**, a reduction in **OB**, and **primary care**, and a reduction in **outpatient nonemergency visits**. These were the RAND Corporation findings based on 10 years worth of data and sadly, their findings have come to pass in Fredericksburg.

**OB:** We have gone from two obstetricians to one, and she only takes call on Mondays and has started delivering OB services in Austin. That does not bode well for the struggle to continue OB services locally.

**Primary Care:** Our family physician of many decades, Dr Nancy Thompson, was told by HCA that she could no longer practice in Fredericksburg at the physician group employed by HCA and my family, along with her 1,500 other patients had to find another doctor. I have the utmost confidence in Nancy and have witnessed world class care afforded to her patients. Dr Thompson's exit has resulted in a huge loss to our community. Not only was she board certified in internal medicine but pediatrics as well. Our family now sees Dr Pam Cantu, who previously practiced at Hill Country Hospital with Dr Thompson, but when HCA/Methodist presented her with a contract that was not compatible with her practice standards, she left and now works with a Sid Peterson physician group. Thanks Pam for sticking to your values for your patients.

**General Surgeons:** We used to have three general surgeons for many decades and now we have two practicing surgeons.

**Breast Cancer Team/Equipment:** Prior to the hospital sale we had a very busy breast cancer program with the commitment to help expedite the time from when a woman experiences an abnormal mammogram all the way to biopsy and surgery. The goal being to have a resolution/ diagnosis in a few days or a week. All women diagnosed with cancer were routinely presented at a monthly breast conference attended by surgeons, radiologists, oncologists, radiation oncologists, nurses, technologists and therapists. The entire breast care team met locally in Fredericksburg. We started this in the 1990's and it was truly an awesome tool and opportunity for healthcare professionals to focus on one patient at a time, deciding what's best for her. Since the sale of the hospital, the breast conference has been cancelled, and there has been a very significant decrease in breast cancer patients being evaluated in Fredericksburg. Hospital support for breast care is clearly waning. Not only has there been a loss of the breast conference, but the stereotactic biopsy machine, donated by the community, is no longer maintained so women have to go elsewhere for some of their biopsies.

**Onsite Diagnostic Imaging**: For 28 years our hospital was covered by two radiologists who were present at the hospital and available for consults and procedures. Now, only one radiologist shows up daily from San Antonio.

In addition to the stereotactic biopsy machine, the hospital's DEXA machine (used to diagnose osteoporosis) is also no longer maintained. The current hospital CT is over ten years old and if it is being used for special procedures, it is not immediately available to emergency department patients. The next closest CT is in Kerrville, 24 miles away. Currently, the waiting time for radiology services including MRI have been reported to be weeks and many patients have left and decided to go elsewhere for more timely and sometimes less expensive care.

**Other physician services** have experienced a diminished community presence including urology, ENT, and ophthalmology to name a few.

**Outpatient Surgeons leaving hospital**: A new independent out-patient surgery center is opening soon just around the corner from the hospital. The center will be welcomed by the community as a state of the art facility for out-patient care and physician owners decided to not partner with the hospital. Why?

**Other Healthcare Services:** Our community has also lost support for palliative care, hospice care, and until recently the sleep lab. We used to have two board certified hospice and palliative care physicians and now have only one.

**Cardiac Cath Lab**: To the hospital's credit, there has been an upgrade to the cardiac cath lab used for more routine and less complicated coronary artery procedures that do not require cardiac surgery backup.

I wonder if the small group that sold our hospital ever imagined such obvious and likely negative consequences of their actions? After all, the idea was to increase the depth and scope of services, not decrease them! So now as a community we are left with the situation where healthcare services are shrinking, doctors are not only avoiding our town but leaving it for other practice opportunities, and even local doctors are avoiding the hospital and will be moving many surgeries to the new outpatient surgery center. Noticeably, important local medical decisions are being increasingly made at the corporate level in Nashville, Tennessee with a definite for-profit bias.

As it stands, the small group who neglected to obtain input from the community before selling our community hospital to HCA/Methodist are the same ones tasked with making sure the hospital lives up to secret commitments HCA/Methodist made (Asset Purchase Agreement) in order to buy the hospital - a clear conflict of interest. After two years, where is the oversight report and how is HCA/Methodist doing regarding their promises to our community. The North Carolina Attorney General is suing HCA for failing to honor the agreements outlined in their Asset Purchase Agreement, which was not secret. The process makes one wonder if the Hill Country Memorial Hospital Board ever contacted Mission Hospital and its doctors in North Carolina as part of their due diligence in vetting our new healthcare partner, HCA/Methodist.

The question remains, how much longer will this downward slide go until HCA/Methodist finds that the situation is too difficult to make a profit and decides to close or sell the hospital? After all HCA is traded on the New York Stock Exchange and they have share holders (not patients) to satisfy.

Ernest Hemingway in the book, The Sun Also Rises, describes two ways to go bankrupt: "gradually, then suddenly". Let's pray that our local hospital challenges will be gradual enough for our community to do something about it.

# EXHIBIT E

# Spending – Grants & Donations

| Create Healthy Management | | 200 W Windcrest St, Fredericksburg, TX 78624 | 830-997-1297 https://www.createhealthy.org/ |
|---|---|---|---|
| Pres & CEO | | Jayne Pope, RN, MBA, FACHE | |
| VP & Strategic Philanthropy | | Amanda M Stevens, MBA, FAHP, CFRE | |
| VP for Finance | | Chris Semmler | |
| Director, Community Engagement | | John Phelps | 830-997-9807 - john.phelps@createhealthy.org |
| Board of Directors | Chair | Jenny Weiser | |
| | Vice Chair | Chris Schoessow | Attorney – Bryla and Schoessow |
| | Secretary | Joel Junker | | Partner – Cameron Brooks |
| | | Dan Sechrist | Owner – Sechrist & Associates |
| | | Carlin Friar | President – The Bank and Trust |
| | | Todd Willingham | President – Bierschwale-Rees Insurance Agency |
| | | John Ramsay, MD | Family Practice Physician \| Cornerstone Clinic |
| | | John Hutcherson, PhD | Retired Financial Advisor |
| Investment Council: | | Jody Donovan, Kyle Frey, Brad Hardin, John Hutcherson | |
| Impact Council: | | Dr. Andrea Bray, Wanda Orte Detmar, Allen Ersch, Dan Kemp, Zuleima Hernandez, Dr. John Ramsay | |

Sep 2024: Notice: CH has spent $3,437,417 in 9 months(Nov 6,2023 to Aug 1, 2024) = $4,583,222/Year

Notice, Since report on Aug 23, 2024 - they report $284K additional spending - at that rate an additional $1,136M will be spent=> $4,573,417 for 2024

Oct 2024: Notice: By far, the largest contributions have been made to the Bethany Lutheran Church Preschool - Jody Donavan is on the CH Investment Council & Campaign Chair for the Preschool project

Notice: $10K still unaccounted for in the totals for Mental Health contributions

Dec 3rd 2024: The total shown on the Website leaves off the Community Donations done earlier in 2024!! It shows $2,225,000 instead of $4,475,000

Also, $25K was publicly expressed as donated for matching funds for the Police Fundraiser that already took place, but is not shown in the totals on the website.

| Create Healthy Website | | 18-Sep-24 | 30-Oct-24 | Change since September: |
|---|---|---|---|---|
| Community | | $2,225,000 | $4,475,000 | $2,250,000 |
| Sponsorships | | $79,700 | $79,700 | $0 |
| Scholarships | | $320,300 | $320,300 | $0 |
| Grants | | $812,417 | $1,089,741 | $277,324 |
| Total so far | | $3,437,417 | $5,964,741 | $2,527,324 |
| | | | | |
| Community Donations: | | | https://www.createhealthy.org/sponsorships-support/ | https://www.createhealthy.org/sponsorships-support/#scholarships |
| 24-Jan-24 | | $250,000 | Fuel to the Fire Matching Donation Campaign | Match up to $25,000 in donations, from October 1 through December 31, 2023 for selected Hill Country Non-profit organizations |
| 3-Nov-23 | | $500,000 | Bethany Lutheran Church - https://www.createhealthy.org/2023/11/03/press-release-create-healthy-invests-in-early-childhood-education/ | New Preschool Facility ($6.3M not including donated land) https://www.fredericksburgstandard.com/2024/01/24/bethany-announces-finances-new-preschool-facility/ |
| 6-Nov-23 | | $500,000 | Little Hearts Child Development Center - located on the property of the Hill Country Needs Council https://www.littleheartsfbg.org/ | Licensed and Trauma-Informed caregivers will be able to care for up to 74 children from low income families - https://www.createhealthy.org/2023/11/05/press-release-create-healthy-donates-to-capital-campaign-to-build-new-early-childhood-development-center/ |
| 24-Jan-24 | | $75,000 | The Texas Wine Auction \| Wellness Uncorked Program https://www.texaswineauction.com/ | cost-free health assessments targeting hospitality personnel, along with a 6-month membership to the Stevens Wellness Center |
| 24-Jan-24 | | $900,000 | Hill Country United Soccer \| Fredericksburg Friends of the Fields | ready for use by Fall 2024, The new complex will include 13 soccer fields, a playground, a concession stand, restrooms, and a covered pavilion. |
| October 2024 | | $1,500,000 | Bethany Lutheran Church Preschool - Building - Jody Donovan | Now expected to cost $7M, CHM has donated $2M out of $5.25M donated to |
| October 2024 | | $750,000 | Little Hearts Child Development Center - Laurie Jenschke | First year salaries, including director's salaries |
| Total Comm Donations | | $4,475,000 | | |
| | | | | |
| Event Sponsorships | | | https://www.createhealthy.org/sponsorships-support/#eventsponsorships | |
| | | $17,000 | FISD - Billie Boosters - https://www.billieboosters.com/ | Custom game-day equipment & Sep 15 Football Game vs Wimberly HS |
| | | $15,000 | FISD Back to School initiative (is this the Fburg Education Foundatio | Items for Health Science Educators |
| | | $15,000 | Boys & Girls Club of Fredericksburg - https://www.bgcatxhc.org/ | $5K for 12th Annual Golf Tournament; $10K for "Face-to-Face" Program |
| | | $10,000 | The Grace Center - https://thegracecenterfbg.org/ | Participated as a "Diamond Stud" sponsor in their 2nd annual fundraiser |
| | | $20,000 | Hill Country Community Needs Council - https://needscouncil.org/ | Food for Kids Program for children identified as undernourished |
| | | $1,500 | Junior Golf Foundation of Fredericksburg https://www.fbgjuniorgolf.com/ | a tee box supporter |
| | | $1,200 | Harper Community Park Association - https://www.harpercommun | Junior Bull Riding Event at the 59th Annual Frontier Days Rodeo. |
| Total Sponsorships: | | $79,700 | | |
| | | | | |
| Scholarships: | | Council: | Erin Carter, Lester Frantzen, Barbara Heinen, Sheryl Jacks, Karen Oestreich | |
| | | | https://www.createhealthy.org/sponsorships-support/#scholarships | |
| 24-Jan-24 | | $50,000 | Gillespie County Fair & Festivals Asso Scholarship Fund | Gillespie County students who are pursuing higher education opportunities. |
| 24-Jan-24 | | $50,000 | Hill Country University Center - Central TX College & Texas Tech | Financial assistance for CTC & Texas Tech classes at HCUC |
| | | | https://www.createhealthy.org/2024/05/28/create-healthy-announces-further-investments-in-hill-country-students/ | |
| 28-May-24 | | $86,200 | FHS Academic Boosters | |
| 28-May-24 | | $18,000 | Fburg Noon Rotary | |
| 28-May-24 | | $18,300 | Harper PTO | |
| 28-May-24 | | $16,500 | Mason ISD Scholarship Foundation | |
| 28-May-24 | | $17,100 | Johnson City Community Education Foundation | |
| 28-May-24 | | $37,200 | Llano ISD Educational Foundation | |
| 28-May-24 | | $27,000 | Comfort Pass It On Scholarship Fund | |
| Total Scholarships: | | $320,300 | | |
| | | | | |
| Grants: | | Council: | Laura Cook(Chair), Jon Crenwelge, Tracey Robledo, Bonnie Stewart | |
| Which area of our community health needs are you impacting? | | | | Service area/County impacted by this project/program. (Select all that apply) |
| ☐ Mental Health(MH) ☐ Childcare/Development(CD) ☐ Healthy Living(HL) ☐ Health Education(HE) | | | | ☐ Gillespie ☐ Blanco ☐ Llano ☐ Mason ☐ Comfort |
| Round 1: | | https://www.createhealthy.org/2024/05/23/create-healthy-announces-first-round-of-grant-funding-for-local-organizations-supporting-health-and-wellness/ | | |
| Round 2: | | https://www.createhealthy.org/2024/07/15/create-healthy-announces-five-new-grants/ | | |
| 14-May-24 | MH | $45,000 | Good Samaritan Center | Bilingual Counseling Service |
| 10-Jun-24 | MH | $11,801 | NAMI TX – Mental Illness | General - https://namitexas.org/ |
| 10-Jun-24 | MH | $150,000 | TX Wine Auction – "Wellness Uncorked Program" | Employee - free counseling, educational seminars, and health fairs. |
| 1-Aug-24 | MH | $84,000 | Caritas Family Assistance Network | Supports FISD Students and Families |
| 1-Aug-24 | MH | $80,000 | Grace Center | Supports Youth Mental Health |
| October 2024 | MH | $5,000 | | trauma-informed support for victims of sexual exploitation |
| SubTotal: | MH | $375,801 | | NOTE: CH Website says it adds to $365,801 (still $10,000 missing?) |
| 10-Jun-24 | CD | $90,000 | Little Hearts Child Development Center - families in trauma | Support Operations – Opens Feb 2025 https://www.littleheartsfbg.org/ |
| 1-Aug-24 | CD | $100,000 | Bethany Lutheran Church Preschool | Support Preschool Expansion |
| October 2024 | CD | $129,324 | First United Methodist Church Mason | Steady Steps Daycare - https://fumcmason.org/steady-steps-daycare |
| October 2024 | CD | $33,000 | Hill Country Community Needs Program | Food for Kids & Mental Health Program |
| October 2024 | CD | $50,000 | Boys and Girls Clubs of the Texas Hill Country | |
| SubTotal: | CD | $402,324 | | |
| 13-May-24 | HL | $55,000 | FISD | Licensed Vocational Nurse – 2024-2025 |
| 14-May-24 | HL | $45,000 | Good Samaritan Center | Specialty Care Services – Labs/Imaging |
| 14-May-24 | HL | $26,616 | FISD – Education Fund | Stonewall Playground Equipment |
| 10-Jun-24 | HL | $30,000 | Boys & Girls Club of Highland Lakes | Llano Club Summer Program |
| 11-Jun-24 | HL | $75,000 | St. Mary's Catholic School | Playground Improvements |
| 1-Aug-24 | HL | $20,000 | Comfort Golden Age Center Foundation | Operations |
| October 2024 | CD. | $50,000 | San Antonio Food Bank | "pop up" food markets in Mason County and Comfort |
| October 2024 | CD | $10,000 | Texas Ramp Project | Ramps for lower income and older adults https://texasramps.org/our-mission/ |
| SubTotal: | HL | $311,616 | | |
| Total Grants: | | $1,089,741 | | Note Create healthy Website shows a total of $1,079,741 |
| Total All: | | $5,964,741 | | |

# EXHIBIT F

# EXHIBIT F

Form 706 (Rev. 8-2009)

Estate of: HANNELORE V. SCHWINDT

Decedent's Social Security Number 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

## SCHEDULE O - Charitable, Public, and Similar Gifts and Bequests

| | | Yes | No |
|---|---|---|---|
| 1a | If the transfer was made by will, has any action been instituted to have interpreted or to contest the will or any of its provisions affecting the charitable deductions claimed in this schedule? If "Yes," full details must be submitted with this schedule. | | X |
| b | According to the information and belief of the person or persons filing this return, is any such action planned? If "Yes," full details must be submitted with this schedule. | | X |
| 2 | Did any property pass to charity as the result of a qualified disclaimer? If "Yes," attach a copy of the written disclaimer required by section 2518(b). | | X |

| Item number | Name and address of beneficiary | Character of institution | Amount |
|---|---|---|---|
| 1 | HILL COUNTRY MEMORIAL HOSPITAL FOUNDATION, INC FREDERICKSBURG, TX 78624 | | 6,505,253. |
| 2 | TEXAS HILL COUNTRY UNIVERSITY CENTER FOUNDATION FREDERICKSBURG, TX 78624 | | 6,505,253. |
| 3 | ROCK FORD INSTITUTE 928 NORTH MAIN ROCKFORD, ILLINOIS 61103 | | 6,505,253. |
| 4 | HILLSDALE COLLEGE HILLSDALE, MICHIGAN 49242 | | 6,505,253. |

# EXHIBIT G

CJB/cyh/Will

# EXHIBIT G

(a) One (1) share to the HILL COUNTRY MEMORIAL HOSPITAL FOUNDATION, INC. of Fredericksburg, Texas with the corpus of this devise to be held, maintained and administered as a perpetual fund and the income generated therefrom to be used exclusively for expenditures of a capital nature benefiting HILL COUNTRY MEMORIAL HOSPITAL or for the purchase of equipment of the hospital but shall not be expended for operating purposes.

(b) One (1) share to the TEXAS HILL COUNTRY UNIVERSITY CENTER FOUNDATION of Fredericksburg, Texas.

(c) One (1) share to the ROCKFORD INSTITUTE, 928 North Main, Rockford, Illinois 61103

(d) One (1) share to the HILLSDALE COLLEGE, Hillsdale, Michigan, 49242.

3.2 <u>Tax Exempt Charities.</u> If any recipient of a bequest under paragraph 3.1 of my Will is not an organization which may receive testamentary gifts which are deductible for federal estate tax purposes under Section 2055 of the Internal Revenue Code of 1986, as amended or under corresponding provisions of subsequently enacted federal estate tax laws, the bequest to that organization shall lapse. I give, devise and bequeath to those beneficiaries under paragraph 3.1 that are bequeathed a portion of my residual estate and which are organizations which may receive testamentary gifts which are deductible for federal estate tax purposes under Section 2055 of the Internal Revenue Code of 1986, as amended or under corresponding provisions of subsequently enacted federal estate tax laws, any bequest which has lapsed because the designated organization is not a qualifying tax exempt organization as defined above. This

H.V.S.

H. S.